**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBORA A. SCHMIDT,<br><br>                    Plaintiff,<br><br>vs.<br><br>MARS, INC. .<br><br>                    Defendant. | Civil Action No.: 09-3008 (PGS)<br><br>MEMORANDUM AND ORDER |

  This matter comes before the Court on Defendant's, Mars, Inc.'s, (Mars) motion for summary judgment. In response to Defendant's motion, Plaintiff, Debora Schmidt (Schmidt) concedes that several of her claims are no longer viable and only gender discrimination in her termination from her job (May 2007) and retaliation remain at issue. In light of the concession, many of the facts set forth in the briefs are no longer germane because they are remote and irrelevant. Within, only the facts relevant to the termination and alleged retaliation are mainly discussed.

  More specifically, Schmidt has many general complaints about the treatment of men and women as employees in the tax department at Mars. These complaints were over a long period of time commencing as early as the mid-nineties. The complaints were:

  (a) men put their feet on desks;

  (b) men play games on their cell phones;

  (c) men stare at their cars in the parking lot;

  (d) men playing fantasy football; and

  (e) Mark Dunckle's (a co-worker) laptop was lighter than hers.

It is well noted that "not all workplace conduct" gives rise to a complaint of discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). For an actionable discrimination complaint, the conduct must be sufficiently severe or pervasive to alter the conditions of employment. *Id*. The above conduct does not meet the threshold especially in light of the two remaining causes of action. In addition to the general complaints, Schmidt's allegations of inadequate pay compared to men dating as far back as the mid-nineties are not at issue here. Hence, all of those facts are not related to the remaining causes of action. See, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). In *Evans*, the Court found "a discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute [of limitations] was passed. It may constitute relevant background evidence in a proceeding which the status of the current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *Id.* In applying *Evans*, the issue is what is the "relevant background evidence" of otherwise outdated material. In this case, the termination claim centers around Wayne Monfries and his supervision of Schmidt. Since Monfries was Schmidt's supervisor from July 2004 through Schmidt's date of termination, this appears to be the relevant time frame. As such, the Court will consider evidence during that approximate time period in considering Schmidt's claims.

Facts

Plaintiff, Debora Schmidt ("Schmidt") is an employee of Mars, Inc. who is responsible for preparing federal taxes for the corporation. Mars, Inc. is a worldwide manufacturer of confectionary, pet food, and other products. Mars' Tax Department ("Tax Department") is located in both Mt. Olive, New Jersey and in McLean, Virginia ("headquarters"). Schmidt worked in the tax department in Mt. Olive, New Jersey.

During the period of Schmidt's employment there was a state tax group, a federal tax group, and an international tax group. There are two parts to the tax process – international and domestic. The Mt. Olive office was responsible for the domestic part and headquarters was responsible for the international part. The international and domestic tax groups must combine their efforts in order to prepare the consolidated tax return. As such, both offices were expected to work together on the consolidated tax reporting.

Schmidt began working for Mars on March 10, 1997 as a Federal Tax Analyst. She was hired by Wayne Monfries ("Monfries") and Ira Siegel. Monfries was Schmidt's direct line supervisor (boss), and shortly thereafter he was reassigned to a new job. Later in 2004, he was reassigned back to Mt. Olive and again supervised Schmidt.

By way of background, an employee's pay is determined by the zone of the position, and the pay ranges or levels within each zone. The higher the zone level (Zone 1 being the highest), the higher the pay, which generally means the employee has greater experience and responsibility. The zone levels are configured by way of some criteria and/or process, and it is sometimes referred to as the "haying" process. The lower the zone number, the higher an employee is in the organization. Thus, an individual holding a Zone 2 position is high up in the organization and a Zone 11 position

3

is lower. At some point after hiring Schmidt, her position was reviewed and she was "hayed" at zone 7.

Thereafter, in October 2000, Schmidt's zone was changed from a Zone 7 to a Zone 6B. Schmidt received an increase in pay when she went to the Zone 6B position, and her title changed from Federal Tax Analyst to Senior Federal Tax Analyst. According to Schmidt, she was given more responsibilities, and her pay increases stopped when she "maxed out" at her zone. When an employee reaches the top of the level, a promotion is necessary to receive a salary increase.

In August, 2004, Schmidt's work circumstances changed dramatically. At this time, Monfries returned from a work assignment in Europe, and he replaced Steve Altamore ("Altamore") as Schmidt's manager. At that time, Mars was reorganizing and as such, there were resource constraints. At the time, Monfries reported to Karen Uranker ("Urankar") who was located at headquarters. Part of Monfries job was to evaluate how the tax work was done, how the tax groups (headquarters and Mt. Olive) were integrated, and whether both locations were necessary to accomplish the work effectively. At some point, Monfries reviewed Schmidt's job description to determine what the expectation of her job was with regard to integration and interaction with the team in headquarters, and whether she was required to travel to headquarters regularly. Since the tax function was split into two locations, travel between the locations was inevitable. Evidently, traveling often between both locations was a problem for Schmidt.

<u>Schmidt's Work History and Termination</u>

On December 22, 2005, Schmidt received a Below Expectations ("BE") performance rating for year-end 2005 from her manager, Wayne Monfries. Mars explains that BE ratings are given to

employees when they meet some of their objectives, but fall short on others.  However, Schmidt disagrees with Mars assertion, and she alleges that Wayne Monfries and Mark Dunckle, another tax department employee, fell short on their job goals; but they were never given a BE rating.  Hence, Schmidt alleges BE ratings are selectively and subjectively given.

Prior to delivering the BE review to Schmidt, Carla Lang of the Personnel and Organization Department met with Monfries to discuss Schmidt's evaluation. This is a standard practice of Mars. One part of Lang's review of the BE evaluation was to have a panel of other employees review whether they agreed or disagreed with the BE rating.  During the panel process, managers provide input into the employee's performance and other members of the panel provide supplemental input if they had worked with the employee or had been involved with the employee's work. The panel members also have the authority to challenge, clarify and assist in the assessment of the employee performance.

Sometime in 2005, the panel process was facilitated by Lang. Monfries, Gaylon Reed, Rich Czermak, and Mike Donnelly participated as panel members[1].  Although the panel process appears to be fair, Schmidt claims this panel was biased and inappropriate because Monfries and Czermak were involved "in a porn scandal," and Donnelly was accused of sexual harassment.

On January 16, 2006, Schmidt left Mars on disability leave due to panic attacks, hypertension, anxiety and depression.  Also in January 2006, Monfries spoke to Schmidt about travel to headquarters to help complete the consolidated tax return.  According to Monfries, Schmidt was required at headquarters in order to address her lack of cooperation with headquarters.  At this time,

---

[1]  From the record, it is unclear if Mr. Urankar (Monfries supervisor) participated.

Schmidt protested traveling to headquarters, because the request was to cover for another tax preparer who was pregnant. Schmidt claims she requested to perform the work remotely, and hence, she did not refuse to do the work.

In March 2006, Schmidt returned from her disability leave to the tax department. Since the Department was working feverishly on the tax returns, Monfries did not address his performance issues with Schmidt immediately. Monfries waited until the conclusion of the tax return process in August, 2006 to discuss Schmidt's performance.

Monfries met with Schmidt in early August 2006 regarding her performance for mid-year, and informed her that she was not meeting his expectations. In reaching this conclusion, Monfries relied on feedback from other employees. For instance, Annette Santos regularly discussed with Wayne Monfries the status of consolidated team projects between the domestic tax groups and the international tax team, and the performance of respective team members. During these meetings, Santos provided her assessment of Schmidt's performance, including that Schmidt had a confrontational style. While working closely with Schmidt on the consolidation process, Santos formed the opinion that Schmidt rarely met deadlines, that she was often defensive, and blamed others for missing deadlines. According to Santos, Schmidt was unable to deliver coherent process plans. In Santos' view, Schmidt's performance did not meet the expectations of her role[2].

In addition to Santos, Peggy Collis also had discussions with Monfries about her interactions with Schmidt during the consolidated federal tax return process. Collis indicated that Schmidt

---

[2] Schmidt finds this evaluation incredulous because there are no writings to confirm same.

frequently failed to deliver her work timely.

A few weeks after her mid-year 2006 review, on August 31, 2006, Schmidt was placed on a Performance Improvement Plan ("PIP") because of her poor performance. Schmidt's PIP specifically stated that Schmidt must develop positive working relationships with key contacts at headquarters including Collis, Santos, and Lang[3]. According to Mars, an employee will not be put on a PIP just because she received a BE rating. However, if an employee receives a BE rating and continues to perform at the same level, then it may be sufficient reason to place an employee on a PIP.

Monfries set forth his objectives for Schmidt in the PIP. According to Schmidt, the issues in the PIP were issues that arose due to Monfries' negligence. According to Schmidt, these objectives included the tax stream project (which Schmidt contends lingered because Monfries failed to sign a contract with a vendor to assist in the project), the Microsoft project calendar (which Monfries specifically admitted was not a workable format), and IDR lateness (which occurred because priorities of the department were often adjusted to a later time due to Monfries illness).

Schmidt acknowledges that Monfries had issues with her prioritizing her job issues, but she refutes that it is a valid claim because Monfries always told her to use her own judgment on various matters, and then blamed her for her incorrect decisions on those matters. Monfries also contended that Schmidt was hesitant to change processes in order to do her job more efficiently. Schmidt claims that when she recommended changes or initiatives, Monfries told her "to mind her own

---

[3] Schmidt denies this fact is true because there are no contemporaneous writings at the time of her criticisms.

business."

According to Mars, the "overwhelming factor" for Schmidt's poor performance rating was because she failed to improve the relationship with headquarters personnel.  Monfries instructed her that it was critical to the success of the tax process that headquarters and Mt. Olive tax functions be integrated.  Monfries did not see Schmidt working toward that goal and this resulted in her poor performance rating.

Immediately after receiving the BE rating and being placed on a PIP, Schmidt claimed and filed a charge that women employees, including herself, were being discriminated against by males who failed to perform adequate work.   Due to the charge, Lang investigated its merits.

 Lang found no substantiation for Schmidt's perception that she was being discriminated against or harassed by Monfries. As part of her investigation, Lang interviewed some employees who may have corroborated Schmidt's charge and others such as Schmidt, Monfries, Kim Morgan (who replaced Schmidt after her termination), and Laura Pfeiffer.  According to Lang, no other female employees complained about the way that Monfries acted.

In November, 2006, Schmidt was injured in an auto accident and became disabled.  Also in November 2006, Schmidt asked for a transition package that would have resulted in her departure from Mars.  That same month, Schmidt was scheduled to meet with Lang to go over her transition package, but was unable to meet with Lang because she was out on disability.

 Schmidt was terminated on May 8, 2007. Mars waited to terminate Schmidt until she had almost exhausted all of her paid short term disability leave.

Ultimately Lang, Urankar, and legal counsel had a role in deciding that Schmidt would be

8

terminated. Monfries did not participate in the decision to terminate Schmidt. Schmidt argues this contention is disingenuous because all the information upon which they relied came from Monfries.

According to Mars, the decision to terminate was based upon Schmidt's poor performance and the fact that she requested a transition package in November, 2006 and in exchange she would have terminated her employment.

Kim Morgan filled the position previously held by Schmidt. The position was a promotion for Morgan who went from a Zone 7A to a Zone 6B. Morgan received an Exceeds Expectations performance rating in 2005 and an Outstanding performance rating in 2006.

### Standard for Summary Judgment

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*

*Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

<u>New Jersey Law Against Discrimination ("NJLAD")</u>

Under NJLAD, Schmidt must demonstrate a prima facie case that she (a) belongs to a protected class; (b) held a position that she was objectively qualified; (c) suffered an adverse employment action; (d) and the adverse action occurred in circumstances giving rise to an inference of discrimination. *See Chertkova v. Connecticut Gen. Life Ins. Co*, 92 F. 3d 81, 90-91 (2d Cir. 1996). It is uncontroverted that Schmidt meets the first three factors; hence, whether Schmidt's termination shows bias is in dispute.

Since Schmidt's replacement was a woman (Kim Morgan who was promoted) it is not apparent that Schmidt was terminated to hire a male. The only other way of showing discrimination

10

is to demonstrate that her dismissal was due to other circumstances giving rise to an inference of discrimination. It is a flexible factor based on the facts of the case. *Id.* One such method could include comparing Schmidt to other employees.

To determine similarly situated employees, courts consider factors such as job function, supervisory responsibility, and salary. *See Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575 (1988); *Monaco v. Am. Gen. Assur. Co*, 359 F. 3d 296 (3d Cir. 2004). In a case like this, where termination was allegedly due to poor performance, the relevant factors include a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating circumstances as would distinguish their conduct or the employer's treatment of them; *See*, *Houston v. Easton Area Sch. Dist*, 355 Fed. Appx. 651, 654 (3d Cir. 2009); *EEOC v. MCI Int'l.*, 829 F. Supp. 1438, 1455 (DNJ 1993); *Radue v. Kimberly-Clark Corp.*, 219 F. 3d 612, 617 (7th Cir. 2000). But it is not a search "for a clone." *Chaney v. Plainfield Healthcare*, 2010 WL 2813644 at *8 (7th Cir. July 20, 2010).

Comparative Persons

There are a number of employees with whom Schmidt may be comparable; but Schmidt suggests that she is similarly situated to Wayne Monfries, Mark Dunckle and Steve Altamore.

Wayne Monfries

In the role of Federal Tax Manager, Monfries was responsible for the tax planning for various Mars entities such as M&M, Mars, Kal Kan, Uncle Ben's, Mars Electronics, and Information Services. Monfries was also responsible for the tax provision, domestic compliance and IRS audits.

Wayne Monfries explained the difference between his job and that of Schmidt. He stated,

the analyst's role is "more about the nuts and bolts, in taking time, preparation of work papers . . ."

The Manager's role is about "managing that process, as well as strategizing and dealing, and negotiations with the IRS . . .[4]"

According to Monfries, when he accepted the role of Americas Tax Manager he assumed more responsibility (Schmidt suggests this is unclear). As Americas Tax Manager, Monfries was responsible for managing the state tax function, international taxes[5], repatriation planning, and transferee tax matters, among other things. He also had responsibility for the international work for Canada, South America, Mexico and Latin America.

According to Monfries, as part of this assignment, he oversaw the state tax work. Monfries explained that "the state tax manager job was responsible for managing a function, so, it was responsible for the delivery of state tax compliance, it was responsible for state tax planning, and managing the audits, and also any sales and use tax audits that were in existence, as well as the unclaimed property reporting that was required of Mars, Inc. The state tax manager role "also supported the local business units with regard to property tax assessments and challenges and was responsible for the management of, or the compliance of sales and use reporting ensuring that was done locally."

Mark Dunckle

Schmidt compares herself to Mark Dunckle. Schmidt claims she was held to a higher

---

[4]     Schmidt refutes this explanation by commenting that the this notion about the jobs is "platonic".

[5]     Schmidt indicates that managers at headquarters handled international taxes.

12

standard than Dunckle by Monfries. Mars claims that there was absolutely no comparison between the two at all in reference to their work because Schmidt worked on the federal tax side and Dunckle worked as a state tax analyst.

Mark Dunckle was "hayed" at a higher level than Schmidt. Dunckle "hayed" at Zone 6A, and Schmidt was "hayed" at a 6B. Mark Dunckle was the State Tax Manager who reported to Monfries. Dunckle contends he was assigned additional audit and negotiation responsibilities in addition to his state tax work. Schmidt argues that she also reported to Monfries and she had additional audit and IRS responsibilities. According to Schmidt, at some point when a co-worker was complaining about Dunckle's work to Monfries, Monfries responded to "give the old fellow a break."

Steve Altamore

Altamore was Schmidt's supervisor from about 1999 to 2004. Altamore was terminated in 2004 because his job was combined with another job during a consolidation. At the time of his departure from Mars, Altamore received a transition package.

With regard to Monfries, there is no similarity. Monfries is Schmidt's direct line manager and he oversees three other people and other tax areas. Hence, Monfries has different responsibilities and his work is much different in scope.

With regard to Altamore, there is no similarity. Most importantly is that in July 2004, Altamore lost his job as a result of two others jobs being combined into one (the combined job is the one Monfries received). In addition, Altamore was a manager. Hence, there is no relevance between Altamore's and Schmidt's termination.

With regard to Dunckle, there appears to be sufficient similarity. Both worked in Mt. Olive,

and Monfries was their direct line supervisor. As such, they were subject to the same standards. Although Schmidt and Dunkle "hayed" in different zones (6B and 6A respectively), the degree of difference appears to be very minor.

Schmidt claims that Monfries was lenient with Dunckle. Schmidt claims that when Monfries heard disparaging remarks about Dunckle, Monfries dismissed the remark by stating "give the old fellow a break." In addition, Schmidt claims Dunckle was paid more than her despite the fact that she worked much harder. In comparing Dunckle and Schmidt, and giving deference to the facts of the non-moving party, the Plaintiff's allegations show some bias.

The nondiscriminatory reasons for Schmidt's termination were Schmidt's poor job performance and the fact that Schmidt had asked for a transition package to terminate her employment. Since Plaintiff's poor job performance is in dispute due to the fact that Dunckle also had performance issues, it is necessary to evaluate the request for a "transition package" as a reason to terminate Schmidt. Schmidt argues it is merely a pretext to overlook the discrimination. In Mars, there were consolidations and terminations for many employees. It would seem reasonable that transition packages were offered to many of the departing employees. The fact that an employee asked for a transition package after receiving a poor performance evaluation does not sound to be unreasonable. The law is an employee can challenge a non-discriminatory reason for dismissal as pretextual by showing the asserted reason for discharge is "unworthy of belief," and that it is more likely the unlawful bias was the real reason for dismissal. *Chertkova, 92 F. 3d* at 92. Here, it appears the request for a transition package prior to her termination and Altamore's receipt of such a termination package questions the truthfulness of the reason for her termination.

Retaliation

      Schmidt's retaliation claim is straight forward. Mars claims Schmidt's retaliation claim is bogus because no discrimination complaint was received until after her BE evaluation. Schmidt claims she expressed complaints about gender discrimination for a long time to other employees. At the end of Schmidt's brief, Schmidt alleges that Urankar (Monfries' boss) advised either Monfries or Altamore to downgrade her work assessment because Urankar was angry about the discrimination accusations Schmidt reported to Urankar's boss.

      Generally, it is unlawful for an employer to discriminate against any employee who has "opposed" an unlawful practice. *See Crawford v. Metro. Gov't*, 129 S. Ct. 846, 850 (2009). Mars contends that it has a formal process for filing discrimination complaints, and that Schmidt failed to file any complaint until after her poor performance evaluation. However, "when an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication – virtually always constitutes the employee's opposition to the activity." *Id. at 851*. Here, Schmidt claims she reported discrimination complaints to Urankar's boss, and thereafter Urankar upset with Schmidt's report, and undertook retaliatory action by terminating her. *See Abramson v. William Paterson College*, 260 F. 3d 265, 286 (3d Cir. 2001). The fact that Schmidt failed to utilize the formal complaint process is not controlling.

ORDER

Based on the foregoing;

IT IS ON this 15th day of November, 2011;

ORDERED that Defendant, Mars, Inc.'s motion the motion for summary judgment (docket entry 70) is denied; and it is further;

ORDERED that Plaintiff's motion for Disclosure, motion for Discovery, motion for Leave to File corrected declaration by Deborah Schmidt (docket entry 102); are dismissed as moot; and it is further

ORDERED that the Motion to Strike the Reply Brief (docket entry 101) is dismissed as moot; and it is further

ORDERED that the Motion to Change Venue from Trenton to Newark (docket entry 110); is denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.